UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No.: 1:26-CV-09395

INNOVENT SEED FUND I, LLC, a Delaware limited liability company,

(ECF CASE)

Plaintiff,

v.
CHRISTOPHER ANZALONE, individually, and NEXTLM, INC., a Delaware corporation,

Defendants.
_______________________________________/

# COMPLAINT

Plaintiff, Innovent Seed Fund I, LLC ("Innovent Fund" or "Plaintiff"), by and through its undersigned counsel, hereby files this Complaint against Defendant Christopher Anzalone ("Anzalone") and NextLM, Inc. ("NextLM"), and alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action for securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, control person liability under Section 20(a) of that Act, fraud, fraudulent inducement, fraudulent concealment, negligent misrepresentation, unjust enrichment, and rescission arising out of Defendant Christopher Anzalone's systematic campaign of deception to induce Innovent Fund to invest time and money into Anzalone's business ventures, CSquared International Inc. ("CSquared") and his successor venture, NextLM.

2. Long after Plaintiff met Anzalone and entered into a substantial and significant business relationship with him, which spanned more than two years, Plaintiff learned that, rather than being an up-and-coming technology entrepreneur, as originally represented, Anzalone is, in

fact, a convicted felon with an extensive criminal history and record as described in more detail below.

3. Plaintiff's investigation has revealed that, despite a partial Presidential clemency, Anzalone remains obligated to pay $16,000,000.00 to the investors he previously defrauded and remains on supervised release. At sentencing, the court made clear that Anzalone was not to participate in "anything that involves money or finances" while on supervised release, and he is required by the Judgment to pay 50% of his monthly gross earnings toward restitution. He also made false statements about his professional credentials and business accomplishments.

4. Anzalone concealed this information from Plaintiff and its affiliates as part of a fraudulent scheme, the purpose of which was to induce Innovent Fund to invest its capital in Anzalone's start-up business ventures and solicit its valuable business contacts and funding sources to participate in funding Anzalone's start-up business ventures.

5. At all times material hereto, and as outlined in further detail below, Anzalone held himself out to Plaintiff as an experienced entrepreneur with a well-established track record who was involved in several cutting-edge start-up technology concepts which, if properly supported, could yield substantial revenue to its investors.

6. Those statements (as detailed below) were false when made and were made with the intent to defraud Plaintiff.

## II. PARTIES

7. Plaintiff, Innovent Fund, is a Delaware limited liability company with its principal place of business at 15260 Ventura Blvd, Suite 1040, Sherman Oaks, California 91403. Innovent Group, LLC, ("Innovent Group") is the sole member of Innovent Fund and is a citizen of the State of California.

8. Innovent Group, LLC is a citizen of California. Its members are traditional trusts: Brett Markinson Separate Property Trust for which Brett Markinson, a citizen of Connecticut, is the trustee; Markinson Children's 2000 Irrevocable Trust FBO Jade Ali Markinson for which Gary Schneider, a citizen of California, is the trustee; and Markinson Children's 2000 Irrevocable Trust FBO Jasmine Alena Markinson for which Gary Schneider, a citizen of California, is the trustee.

9. Brett Markinson ("B. Markinson"), a non-party to this action, is the CEO and Founder of Innovent Fund. He is an entrepreneur with an established track record of developing start-up businesses that leverage disruptive technology. B. Markinson has helped develop numerous businesses over the course of his career and has helped those businesses obtain capital with a view toward ultimately selling those businesses at a substantial profit. B. Markinson served as a director of CSquared from December 31, 2024, and as a director of NextLM from October 7, 2025.

10. Defendant, Christopher Anzalone, is an individual residing at 113 West 27th Street, Floor 3, New York, New York 10001. Upon information and belief, Anzalone is a citizen of the State of New York. Anzalone is the CEO and Founder of NextLM and was the founder and CEO of CSquared International, Inc. (d/b/a Knowledge.com).

11. Defendant, NextLM, is a Delaware corporation with its principal place of business at 535 Fifth Avenue, 4th Floor, Suite 1016, New York, New York. NextLM is a citizen of Delaware and New York. At all material times, Anzalone acted as NextLM's President and Chief Executive Officer and controlled NextLM through CaRA Consulting, LLC, which held approximately 73.05% of NextLM's fully diluted capitalization as of March 26, 2026.

## III. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

The First and Second Causes of Action arise under the laws of the United States. Specifically, they arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court also has jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, which grants the district courts exclusive jurisdiction over such claims. This Court independently has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of California through its sole member, Innovent Group, LLC, which is a citizen of California and whose members are citizens of Connecticut and California. Defendant Anzalone is a citizen of New York, and Defendant NextLM is a citizen of Delaware and New York, its state of incorporation and the state of its principal place of business, respectively. Plaintiff is not a citizen of any state of which any Defendant is a citizen. Innovent Fund seeks recovery of, among other categories of damages, at least $200,000 in invested capital, independently satisfying the amount-in-controversy requirement. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a). Those claims arise from the same facts as the federal claims and form part of the same case or controversy.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Defendant Anzalone resides in this District. NextLM maintains its principal place of business in this District. A substantial part of the events or omissions giving rise to the claims occurred in this District, including acts constituting the Exchange Act violation, such as the October 28, 2024 meeting in New York City as described more fully below.

14. Personal jurisdiction over Anzalone is proper because he resides in this District and committed tortious acts within this District. Personal jurisdiction over NextLM is proper because

NextLM maintains its principal office in New York, New York.

## IV. FACTUAL ALLEGATIONS

### A. The Investment Relationship.

15. New York University's Entrepreneurship Institute publishes a periodic newsletter in which it highlights what NYU considers to be impressive entrepreneurs.

16. On or about August 12, 2024, Jade Markinson ("J. Markinson"), an Innovent Fund representative, first contacted Anzalone via LinkedIn after reading about his fundraiser for CSquared, a technology company doing business as "Knowledge," in the NYU newsletter.

17. On August 15, 2024, Anzalone, Anzalone's associate Cadogan Price ("Price"), and J. Markinson conferred via video conference. During this conference, Anzalone, cloaked in the aura of legitimacy that NYU's inclusion of CSquared in its newsletter provided, touted his experience with a previous start-up company that he co-founded and for which he served as CEO, a go-to-market ("GTM") sales agency called Demand Capture, which performed outbound sales for software companies. Anzalone represented that Demand Capture was developing a software platform designed to enable businesses to utilize market data to generate revenue. Anzalone further represented that he sought to raise capital for Demand Capture, which he claimed was already generating actual revenue, with the software platform as a core component of the business, and that he valued the company at $30 million. Anzalone also represented that he had spent "10 years in GTM sales."

18. These statements were false. On March 27, 2015, the court in *United States v. Anzalone*, No. 1:14-cr-20737-FAM (S.D. Fla. Mar. 31, 2015) (the "Anzalone Criminal Case") sentenced Anzalone to 15 years in federal prison. He thus could not have spent the prior ten years

in GTM sales. **Exhibit 1**, Judgment in a Criminal Case, ECF No. 47 (Moreno, J.).[1]

19. Anzalone's representations about Demand Capture were similarly false or materially misleading. On information and belief, Demand Capture was not, as of the August 15, 2024 meeting, generating any profits. As of 2024, Demand Capture had "concluded its independent operations."[2]

20. During the August 15, 2024 meeting, Anzalone touted "CSquared," which he represented as a cutting-edge technology company built around the software platform originally developed for Demand Capture. During the meeting, Anzalone proclaimed that CSquared was worth $30,000,000.

21. On or about August 15, 2024, in furtherance of his fraudulent scheme, Anzalone provided Plaintiff with a pitch deck and financial model for CSquared. Anzalone did not, during this meeting, disclose his criminal past or his ongoing financial liabilities to his victims.

22. In reliance on Anzalone's representations about his experience and representations as to the value of CSquared, J. Markinson shared Anzalone's pitch deck and product demonstration with other potential investors.

23. Between September 2, 2024 and October 1, 2024, Anzalone continued to aggressively pursue Plaintiff, seeking B. Markinson's mentorship and partnership.

24. For example, on September 10, 2024, Anzalone contacted J. Markinson, and requested that Plaintiff provide a capital injection to CSquared of $250,000, stating that he "just need[ed] money" to "finalize product development, build out … GTM strategy, and fully leverage our ZoomInfo partnership . . ." and "d[idn't] care about valuation." Anzalone again touted his "10 years in GTM sales" experience. These representations were made to induce Plaintiff to believe

---

[1] Entered on the docket on March 31, 2015.
[2] https://www.demandcapture.com/ (last accessed Oct. 23, 2026).

that Anzalone and CSquared had a currently existing partnership with ZoomInfo.

25. On September 13, 2024, Anzalone wrote to J. Markinson that, "[g]iven where we are with our product launch and coordination with ZoomInfo's new API launch, it makes strategic sense to raise $500k within the next 30 days."

26. On or about October 1, 2024, Anzalone asked J. Markinson by email for more introductions, representing that CSquared was six weeks away from "Commercial Launch" and needed capital, and wrote: "We need marketing infrastructure to leverage our momentum. It will take $50k-$100k to make it happen. Where would you have to be on the cap table for this to make sense for you?"

27. J. Markinson agreed to take a call with Anzalone to discuss what Innovent would require to consider the opportunity. During the call, J. Markinson explained that because CSquared did not yet have a company, but only an idea, Innovent would need to own a significant portion of the company at that early stage.

28. On October 4, 2024, Anzalone once again emailed J. Markinson with Price copied: "Cadogan [Price] and I have been talking, and we'd like to explore this partnership opportunity. We were hoping to understand a bit more about how you envision this in terms of equity, expectations, and capital."

29. J. Markinson agreed to organize a team call so that the rest of the Innovent Fund team could meet Anzalone and Price and see the product.

30. On October 10, 2024, Innovent Fund's team held a meeting with Anzalone and Price. Anzalone still did not disclose during this meeting his criminal past, his ongoing financial liabilities to his victims, or that the court in the Anzalone Criminal Case directed him at sentencing not to engage in "anything that involves money or finances." **Exhibit 2**, Sentencing Hr'g Tr. 77:2-

19, Mar. 27, 2015, [Anzalone Criminal Case, ECF No. 81].

31. On or about October 21, 2024, Anzalone provided Innovent Fund with a written memorandum concerning Knowledge's business operations, growth strategy, fundraising plans, and his experience in the industry. The memorandum continued to tout Anzalone's professional background and business accomplishments, with representations such as: "Chris brings 10 years of experience as a high-performing institutional sales leader"; "[Chris] brings deep expertise in this area, having built and operated DemandCapture, an award-winning sales agency"; and "[g]iven our background in building and running a recognized sales agency, we are well-positioned to execute sales-led growth (SLG) strategies effectively."

32. The October 21, 2024 memorandum also referred repeatedly to "our partnership with ZoomInfo," stated that "ZoomInfo [was] running ads to promote Knowledge," and built its $100,000 launch budget around that traffic, allocating $15,000 to email tools to capture visitors from "ZoomInfo's ads" and $40,000 to retargeting "the traffic generated by ZoomInfo's campaigns."

33. The representations Anzalone made in September and October 2024 regarding CSquared's "partnership" with ZoomInfo were false. On information and belief, CSquared did not as of September 2024 or anytime thereafter have any "partnership" with ZoomInfo.

34. The October 21, 2024 memorandum did not disclose Anzalone's criminal history, incarceration, supervised release status, substantial restitution obligations, or Judge Moreno's directive.

35. On October 28, 2024, B. Markinson, J. Markinson, Price and Anzalone met for lunch at ZeroBond in New York City. During the meeting, B. Markinson and J. Markinson shared Innovent Fund's capabilities and explained that Innovent Fund would conduct a financial modeling

exercise and technical review of Anzalone's platform to understand the strengths and weaknesses of the business, assess the value of a potential partnership, and determine how much of the company Innovent Fund would need to own given the work its office would undertake in assisting Anzalone to bring CSquared to market.

36. Anzalone *still* did not disclose his criminal past, his ongoing financial liabilities to his victims, or Judge Moreno's directive during the October 28, 2024 meeting.

37. On October 31, 2024, Anzalone demonstrated CSquared's sales platform to B. Markinson and Innovent's associate with market knowledge, Laurence Sotsky.

**B. <u>The First Investment.</u>**

38. On or about December 31, 2024, in reliance on Anzalone's representations, the following agreements were entered into with CSquared, each signed by Anzalone as CEO of CSquared and by B. Markinson as Managing Member of the applicable Innovent entity:

a. An Advisory Agreement, between an Innovent Fund related entity, Innovent Advisory, and CSquared, the purpose of which was, among other things, for Innovent Advisory to advise CSquared on matters relating to its actual or potential business, technology or products and to add B. Markinson to CSquared's Board of Directors ("CSquared Advisory Agreement") in exchange for which Innovent Advisory was to receive warrants to acquire equity in CSquared.

b. A Promissory Note issued to Innovent Group, the sole member of Innovent Fund, in the principal amount of $100,000, bearing interest at 8% per annum, pursuant to which Innovent Group agreed to lend/invest funds to CSquared, which funds would be converted into an equity investment in the event that any of the following milestones were achieved: (i) a subsequent round of equity financing; (ii) the closing of a public offering;

or (iii) the closing of a corporate transaction such as a merger or similar event ("CSquared Convertible Note"). **Composite Exhibit 3**.

c. A Note Purchase Agreement between CSquared and Innovent Group dated December 31, 2024 ("Note Purchase") which set forth the manner in which the CSquared Convertible Note would be converted into equity. **Composite Exhibit 3**.

39. From the outset, Anzalone sought B. Markinson's mentorship and partnership, not merely a loan. He invited Innovent into CSquared as a partner and asked Innovent Advisory to guide the company. Through the CSquared Advisory Agreement, B. Markinson joined CSquared's Board of Directors and received access to confidential company information. Anzalone knew that he was the only source of information about his own background. He knew Plaintiff was relying on him to be truthful about it. At that point, the parties entered into a confidential business relationship of trust and confidence requiring complete honesty and transparency not only with respect to Anzalone's background but with respect to his future actions.

40. It was the mutual intent of the parties that Plaintiff would help build CSquared, during which time the CSquared Convertible Note would vest and create equity for Innovent Fund.

41. Following the execution of the CSquared Advisory Agreement and the CSquared Convertible Note, between January 2025 and May 2025, Innovent Advisory provided substantial advisory services to CSquared without any cash fee, including advice on pitch decks, advertising, product testing, a pre-seed founder contest, and strategic introductions to potential investors.

42. On or about June 6, 2025, Innovent Group transferred and assigned all of its right, title, and interest in the CSquared Convertible Note to Innovent Fund pursuant to a Convertible Note Transfer Agreement, and CSquared, through Anzalone, acknowledged and consented to such transfer ("Note Transfer Agreement").

43. Never once during this time did Anzalone disclose his criminal background or the substantial unsatisfied restitution judgment against him.

44. Innovent Group assigned all claims arising from the December 31, 2024 note, including those asserted herein to Plaintiff Innovent Fund.

### C. <u>The Second Investment.</u>

45. On or about August 25, 2025, in continued reliance on Anzalone's representations, Innovent Fund invested an additional $100,000 into CSquared under the same convertible note terms as the CSquared Convertible Note. In connection with this second investment, Innovent Fund directly expended out-of-pocket reliance funds to facilitate and pay for the conversion of the business entity to Delaware, relying directly on Anzalone's fraudulent misrepresentations. **Exhibit 4**.

### D. <u>The Transition to NextLM.</u>

46. As of September 2025, CSquared had failed to garner significant interest in the marketplace and Anzalone decided to turn his attention to another business venture, known as "NextLM." Thereafter, CSquared determined that it would cease pursuing the business activities funded by the outstanding notes and would transfer those obligations and related instruments to NextLM.

47. On or about September 22, 2025, NextLM was formed and incorporated in the State of Delaware.

48. On the same day, NextLM, acting through Anzalone as its President and Chief Executive Officer, entered into a Note Purchase Agreement with Innovent Fund and issued Convertible Promissory Notes to Innovent Fund in the aggregate principal amount of $200,000, thereby assuming and continuing the investment relationship previously established with

CSquared.

49. Each Note Purchase Agreement that Anzalone executed with Plaintiff, the December 31, 2024 CSquared Note Purchase and the September 22, 2025 NextLM Note Purchase Agreement, contained "Bad Actor Representations and Covenants" in Section 5.9 and attached as Exhibit B the disqualifying events set forth in Rule 506(d) of Regulation D, 17 C.F.R. § 230.506(d), including a conviction, within ten years before the sale, of any felony or misdemeanor in connection with the purchase or sale of any security. Those provisions required *Innovent* to represent that *it* was not subject to any such disqualifying event and to notify the Company immediately if it became subject to one. The CSquared Note Purchase further prohibited any transfer of the notes that would render CSquared ineligible to rely on Rule 506. Despite Anzalone himself insisting on representations that Innovent was not a "bad actor," Anzalone never disclosed that *he himself* had been convicted of such an offense and was such a "bad actor."

50. NextLM is an AI powered B2B sales intelligence platform that attempts to identify which potential customers are actively involved in researching or showing intent to buy in contrast to the traditional sales and research model which relied upon generic sales leads.

51. Anzalone touted this potential technology to Plaintiff while continuing to hide his criminal background and restitution obligations.

52. Through CaRA Consulting, LLC, Anzalone controlled a majority of NextLM, holding approximately 73.05% of its fully diluted capitalization as of March 26, 2026.

53. On November 24, 2025, B. Markinson organized an event for NextLM with potential customers. Anzalone presented NextLM and what it could do to the group. B. Markinson and Anzalone touted the product and Anzalone's ability to make NextLM successful.

54. Amer Ahmad ("Ahmad"), Anzalone's close friend, who unbeknownst to B.

Markinson, Anzalone met while in federal prison, participated in the meeting. Ahmad was working with Anzalone to develop NextLM and was a director of both CSquared and NextLM.

55. Following the meeting, one of the potential customers of NextLM contacted B. Markinson and advised him that he knew that Ahmad was a convicted felon and, as a result, this investor encouraged B. Markinson to investigate what types of individuals were promoting NextLM.

56. B. Markinson contacted Anzalone and confronted him with the information he had learned about Ahmad.

57. Thereafter, on or about December 5, 2025, in response to B. Markinson's inquiry, Anzalone finally disclosed his own criminal background but sugarcoated it by representing that he was a young kid who was working for a securities marketing firm and was a victim of a sting where the company he worked for was engaged in illegal marketing practices and, as a manager, he was liable and took a "plea deal." He represented that his sentence was eventually commuted by Joe Biden given his circumstances and he was rebuilding his life. This account was false and misleading. Anzalone was not a bystander caught in a sting. He admitted that he was the "organizer and leader" of a scheme that took more than $15 million from about 224 investors. He did not disclose that he remained on federal supervised release, that he owed $16,000,000 in restitution, that the sentencing court had directed that he not participate in anything involving money or finances, or that he was prohibited from "associat[ing] with any person convicted of a felony. …" Exhibit 1, p. 3.

58. On December 5, 2025, Anzalone sent an email to B. Markinson attaching what he represented as his background check while affirmatively representing: "I just received my background check and it came back completely clean. Nothing appears at all."

59. Anzalone further represented: "On paper, neither of us [referencing Ahmad] shows any criminal history since the cases were from more than a decade ago."

60. B. Markinson informed Anzalone that Ahmad's sentence had not been commuted and Ahmad's criminal background would present the company with a problem and, therefore, Ahmad must resign from the Board of Directors and also could not be an officer of the company.

61. Anzalone agreed and asked Ahmad to resign, which Ahmad did.

62. At no point did Anzalone disclose the full extent of his criminal background which he continued to fraudulently conceal.

63. In the same December 5, 2025 email, Anzalone represented: "This puts us in a much stronger position to manage anyone who takes issue. I understand the importance of optics and we will take whatever steps are needed on the external side to keep things clean for investors and partners."

64. Anzalone confirmed in the email that Ahmad was "both my closest friend and a tremendous part of this company." Anzalone further represented to B. Markinson that, notwithstanding Ahmad's criminal history, Anzalone would continue to work with Ahmad in their efforts to bring NextLM to market.

65. After Ahmad resigned from the Board, B. Markinson continued to work with Anzalone. He did so in reliance on Anzalone's December 5, 2025 assurances that his record was "completely clean" and that his history was limited to an old plea deal and a commuted sentence. Plaintiff did not then know that Anzalone was on supervised release, that he owed $16,000,000 in restitution, that he was prohibited from participating in anything involving money or finances, that he was prohibited from associating with convicted felons, or that he had been the leader of the prior criminal scheme.

66. Plaintiff discovered the full extent of Anzalone's criminal record in June 2026. Shortly thereafter, Innovent's counsel advised counsel for NextLM about Anzalone's criminal record, and Anzalone's obvious obligation to make a full disclosure to NextLM's Board.

67. In response, Anzalone orchestrated B. Markinson's removal from NextLM's Board as part of his plan to continue to conceal his criminal record and to manage and operate NextLM without oversight.

68. On July 31, 2026, Anzalone sent an email to an investor whom Innovent Fund had introduced to Anzalone, Tucker Tooley (and others). In it, Anzalone touted an "exciting company update" and buried a sanitized disclosure of his criminal past, stating: *"Twelve years ago, as a young man, I pled guilty to a federal offense. I was later granted executive clemency by President Biden."*

69. This buried disclosure materially and purposefully omitted Anzalone's active supervised release status, his $16 million restitution obligation, and Judge Moreno's directive in the Anzalone Criminal Case that Anzalone "not participate in anything that involves money or finances," rendering it a materially misleading half-truth.

70. The foregoing conversation and written representations, made by Anzalone, were deliberately and knowingly incomplete.

71. Following these events, B. Markinson decided to dig deeper into Anzalone's background.

**E. <u>The Full Extent of Anzalone's Criminal Background.</u>**

72. B. Markinson's investigation revealed that Anzalone had been convicted of Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. § 1349 in the United States District Court for the Southern District of Florida, Case No. 1:14-cr-20737-FAM, before Judge

Federico A. Moreno.

73. The information discovered revealed that Anzalone had previously been convicted of operating a multi-year, multi-faceted fraud scheme through three corporate entities: Liberty International Financial Services ("LIFS"), Liberty International Holding Corporation ("LIHC"), and Allied Financial Strategies, Inc. ("Allied"). Anzalone served as co-founder and operational head of LIFS and LIHC with co-conspirator Jeffrey Schuler and was the founder of Allied. *See* Information, Case No. 14-20737-CR-MORENO (S.D. Fla. Oct. 28, 2014); ECF No. 28, Factual Proffer Statement at pp. 1-3.

74. Through LIFS, between 2010 and 2012, Anzalone and his co-conspirators solicited investors nationwide for purported purchases of precious metals such as gold, silver, and palladium. While LIFS initially made some legitimate trades, within the first year it stopped making actual trades, and Anzalone diverted investor funds for Anzalone's personal benefit. As part of Anzalone's criminal scheme, investors sent approximately $4 million for metals trades, but LIFS invested less than $200,000 in actual purchases. Between 2011 and 2013, Anzalone solicited investors to purchase over-the-counter (penny) stocks based on false representations that LIHC owned real estate assets and millions of dollars in precious metals held in Panama. Anzalone induced his victims to invest more than $9 million in LIHC stock.

75. Through Allied, in 2013, Anzalone employed a "block trade" scheme, falsely representing to victims that a hedge fund or institutional investor intended to purchase a large block of shares at approximately $10 per share, when investors could purchase shares for only $1. No such hedge fund or institutional investor existed. Anzalone's victims invested over $3 million in Allied.

76. In total, approximately 224 victims invested more than $15 million through wire

transfers and mailed checks, with only approximately $3 million returned to investors. Anzalone misappropriated investor funds to support a lavish lifestyle, including leasing expensive cars, renting an expensive apartment, and flying on private jets. At sentencing, the Government noted that Anzalone was "spending a hundred grand a month" and living in a mansion with two chefs, Lamborghinis, and Rolls-Royces. Exhibit 2, p. 31.

77. Anzalone admitted as part of his guilty plea that he was an "organizer and leader" of the conspiracy. The prosecutor compared Anzalone to Bernie Madoff and Scott Rothstein, stating: "Without him, this show doesn't happen." The Government initially sought to deny Anzalone credit for acceptance of responsibility because he continued committing crimes while released on bond before his sentencing, including stealing over $750,000 from an additional investor while awaiting sentencing. On March 27, 2015, the court in the Southern District of Florida (Moreno, J.) sentenced Anzalone to 15 years' imprisonment—one year above the top of the advisory guidelines—followed by three years of supervised release and ordered restitution of $16,000,000 to the approximately 224 victims. **Exhibit 1**.

78. At sentencing, Judge Moreno made clear his intent that Anzalone not be permitted to work in any capacity involving money or financial activities during his supervised release: "[H]e's not going to participate while he is on supervised release on anything that involves money or finances or anything like that, despite the talent that he has. He has talent, he's a good gabber. I understand that, but I don't want him to do that. I want him to do the minimum wage type of job, because otherwise someone else may get schemed." **Exhibit 2**, p. 77. The written Judgment requires Anzalone to "provide complete access to financial information, including disclosure of all business and personal finances, to the U.S. Probation Officer." **Exhibit 1**.

79. On December 12, 2024, President Biden granted Anzalone executive clemency,

commuting his sentence of confinement. However, the clemency order explicitly left "intact and in effect" the three-year term of supervised release imposed by the court "with all of its conditions and all other components of each respective sentence." Accordingly, Anzalone's three-year term of supervised release began upon his release from custody, and he remains under active federal supervision through 2027, subject to conditions including reporting to a probation officer, refraining from committing any federal, state, or local crimes, providing complete access to his financial information, and complying with numerous other standard and special conditions. The clemency did not vacate the $16,000,000 restitution judgment, which remains fully enforceable, unsatisfied, and requires Anzalone to pay 50% of his monthly gross earnings toward the judgment.

80. Additional research also confirmed that Ahmad is also a convicted felon, having been convicted of bribery and conspiracy in the United States District Court for the Southern District of Ohio, Case No. 2:13-cr-00183-MHW. Thus, Anzalone's association with Ahmad violated the conditions of his supervised release that he not "associate with any … person convicted of a felony…" **Exhibit 1**, p. 3.

81. Thus, the representations Anzalone made about his background, even after issues with it were initially discovered by B. Markinson, were knowingly and intentionally false and incomplete.

82. At the time that Anzalone made these representations, he had already been convicted for Conspiracy to Commit Mail and Wire Fraud, owed $16 million on a federal restitution judgment, and was either in some form of custody of the Bureau of Prisons or on supervised release under the supervision of the United States Probation Office.

**F. <u>Fraudulent Representations Regarding Credentials and Business Accomplishments.</u>**

83. Throughout the investment relationship, from August 2024 through the present,

Anzalone represented to Innovent Fund and its representatives that he held the following credentials and accomplishments:

(a) Founder of Demand Capture, which purportedly achieved $1 million in annual recurring revenue in 90 days, and purportedly sold the agency;

(b) Contracts with 44% of the Fortune 100;

(c) Researcher on a National Science Foundation-funded study on Algorithmic Biases; and

(d) Certified Professional Google Cloud Architect.

84. On information and belief, these representations were false when made and Anzalone fabricated them to induce Innovent Fund's investment and Innovent Advisory's services.

**G. Retaliatory Board Removal.**

85. B. Markinson eventually learned the truth about Anzalone's criminal past (as detailed above), despite Anzalone's efforts to obfuscate and deceive.

86. When B. Markinson learned of Anzalone's criminal history, including the active $16 million federal criminal restitution judgment, active supervised release status, and judicial business restrictions, he advised Anzalone that Anzalone was required to disclose these issues to the board. Rather than address B. Markinson's concerns and disclosure obligations through a coordinated communication to other board members and investors, Anzalone retaliated and orchestrated B. Markinson's removal from the board. Anzalone's personal motivation throughout was to extract capital and uncompensated advisory services from Plaintiff to build a venture he could rapidly liquidate for his personal benefit—specifically to satisfy his personal $16,000,000 criminal restitution obligation—while concealing that his active supervised release and restitution judgment made long-term corporate building impossible.

## FIRST CAUSE OF ACTION

(Violation of Section 10(b) of the Exchange Act and Rule 10b-5)(against Anzalone)

87. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 86 as if fully set forth herein.

88. The CSquared Convertible Note, the second CSquared convertible note, and the NextLM notes are "securities" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10). The notes were purchased for investment, not for commercial or consumer purposes. They bore interest and were designed to convert into equity upon financing, public offering, or corporate transaction. The parties intended that the notes would "create equity" for Innovent Fund. CSquared offered notes and simple agreements for future equity ("SAFEs") to other investors, and Anzalone sought introductions to additional investors. Innovent Fund reasonably viewed the instruments as investments. No other regulatory scheme reduced the risk of the investment.

89. Plaintiff purchased securities in the following transactions: (a) on December 31, 2024, Innovent Group purchased the CSquared Convertible Note for $100,000, and on June 6, 2025, assigned that note to Innovent Fund; (b) on August 25, 2025, Innovent Fund purchased a second CSquared convertible note for $100,000; and (c) on or about October 22, 2025, under a Contribution and Exchange Agreement, Innovent Fund exchanged its CSquared notes for the NextLM Notes issued under the September 22, 2025 Note Purchase Agreement.

90. Anzalone, directly and indirectly, used the means and instrumentalities of interstate commerce, including email, LinkedIn messages, and video conferences between New York and California, in connection with these purchases.

91. Anzalone made false statements of material fact before each purchase. Before the

December 31, 2024 purchases, Anzalone told J. Markinson, on August 15, 2024 by video conference, that he had "10 years in GTM sales," that Demand Capture was generating revenue, and CSquared was worth $30 million; told J. Markinson, on September 10, 2024, that CSquared had an existing "ZoomInfo partnership"; and sent Innovent the October 21, 2024 written memorandum described herein. Before the August 25, 2025 purchase and the October 2025 exchange, Anzalone repeated his misrepresentations about his credentials and accomplishments described herein to B. Markinson and J. Markinson.

92. Anzalone did not merely stay silent. He affirmatively described his last decade as "10 years in GTM sales" and a record of building and selling companies. Anzalone spent most of that decade in federal custody following his conviction for defrauding investors. His statements were therefore misleading half-truths, not pure omissions. Having chosen to speak about his background, Anzalone was required to disclose the facts needed to make his statements not misleading. He did not disclose his federal conviction for an investor fraud scheme, his $16,000,000 restitution judgment, his active supervised release, or the sentencing court's direction that he not participate in anything involving money or finances and that he refrain from associating with convicted felons.

93. Anzalone also employed a device, scheme, and artifice to defraud and engaged in acts, practices, and a course of business that operated as a fraud on Plaintiff, in violation of Rule 10b-5(a) and (c). His scheme was to conceal his criminal history and obligations while extracting capital and uncompensated services from Plaintiff.

94. The misstated and concealed facts were material. A reasonable investor would consider it important that the founder and chief executive of a startup had been convicted of defrauding investors, ordered to refrain from participating in "anything that involves money or

finances," owed $16,000,000 in restitution payable from half of his earnings, remained under federal supervision, and fabricated his credentials.

95. The concealed conviction was not merely a matter of personal history; it bore directly on the lawfulness of the offering of the very securities Plaintiff purchased. Rule 506(d) of Regulation D, 17 C.F.R. § 230.506(d), adopted under Section 926 of the Dodd-Frank Act, bars an issuer from relying on Rule 506 where any director, executive officer, or beneficial owner of 20% or more of its voting equity has been convicted, within ten years before the sale, of a felony in connection with the purchase or sale of any security. Anzalone was CSquared's Chairman, Chief Executive Officer, director, and controlling stockholder, and his conviction arose from a scheme that included the sale of penny stock and a fraudulent block-trade scheme. The judgment of conviction in the Anzalone Criminal Case was imposed on March 27, 2015, within ten years before the December 31, 2024 purchase of the CSquared Convertible Note. The Securities and Exchange Commission has made clear that investors should be informed of bad-actor events so that such information is appropriately presented in the total mix of information available to them. Because each Note Purchase Agreement incorporated the Rule 506(d) disqualifying events and conditioned the transaction on bad-actor representations, the parties themselves treated bad-actor status as significant to the investment. A reasonable investor would have viewed the fact that the issuer's chief executive had such a conviction as significantly altering the total mix of information available.

96. Anzalone acted with scienter. He knew his statements were false and misleading when made. He had pled guilty to defrauding approximately 224 investors through false statements. He knew the sentencing court had directed that he not participate in financial ventures. He signed Note Purchase Agreements that recited the Rule 506(d) disqualifying events and

required *Plaintiff* to represent that it was not a bad actor, while concealing *his own* disqualifying conviction. He later falsely stated that his background check came back "completely clean," and that neither he nor Ahmad showed any criminal history "since the cases were from more than a decade ago." He had a concrete motive to deceive Plaintiff: to build a venture he could quickly sell to satisfy his personal restitution obligation. When his history came to light, he caused B. Markinson to be removed from NextLM's Board.

97. Plaintiff reasonably and justifiably relied on Anzalone's statements. Innovent Group, and Innovent Fund as its assignee, relied on the statements alleged herein in purchasing the CSquared Convertible Note. Innovent Fund relied on them, and on Anzalone's continued silence about his history, in purchasing the second CSquared note and in exchanging its notes for the NextLM Notes. Plaintiff would not have entered into any of these transactions had it known the truth.

98. Anzalone's fraud caused Plaintiff's losses. The concealed facts were the very risks that materialized. Anzalone's restitution obligation and supervised release made long-term company-building impossible. Consistent with those concealed constraints, CSquared ceased pursuing its business, and Anzalone later abandoned the agreed strategy of obtaining venture funding and sought a quick sale of NextLM for his own exit. As a result, the NextLM Notes are worth substantially less than the $200,000 Innovent Fund paid.

99. As a direct and proximate result of Anzalone's violations of Section 10(b) and Rule 10b-5, Plaintiff has suffered damages, including $200,000 in invested capital, in an amount to be determined at trial.

100. This claim is timely under 28 U.S.C. § 1658(b). It is brought within two years after Plaintiff discovered the facts constituting the violation and within five years after each violation.

## SECOND CAUSE OF ACTION

(Violation of Section 20(a) of the Exchange Act)(against Defendant Anzalone)

101. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 86 as if fully set forth herein. This Count is expressly pled in the alternative to the First Cause of Action under Federal Rule of Civil Procedure 8(d)(2). It seeks to hold Anzalone liable, as the person who controlled CSquared, for CSquared's primary violation of Section 10(b) and Rule 10b-5 in the sale of the CSquared securities. Plaintiff does not seek to recover the same damages twice. Any recovery under this Count will be reduced by any amount recovered for the same loss under the First Cause of Action, and Plaintiff seeks a single recovery for each loss.

102. CSquared committed a primary violation of Section 10(b) and Rule 10b-5. CSquared issued and sold the CSquared Convertible Note and the second CSquared convertible note. In connection with those sales, CSquared, speaking and acting through its Chief Executive Officer, Anzalone, made the misstatements and engaged in the scheme alleged herein. Because Anzalone acted within the scope of his authority as CEO, his scienter, alleged in the First Cause of Action, is imputed to CSquared. CSquared's violation caused the losses alleged in the First Cause of Action.

103. Anzalone was a controlling person of CSquared within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). He founded CSquared and served as its Chief Executive Officer. He signed each CSquared transaction document described herein. He directed CSquared's fundraising and investor communications, including the communications with Plaintiff that constitute the primary violation. He also caused CSquared to cease its business and transfer its obligations to NextLM.

104. Anzalone held a controlling majority of CSquared's stock in his own name at all

material times. His Amended and Restated Subscription Agreement dated December 30, 2024 recorded 7,112,664 shares of common stock, and CSquared's board issued him all 1,000,000 outstanding shares of its Series A Preferred Stock. When CSquared converted to a Delaware corporation in August 2025, Anzalone held 8,112,664 of the 11,000,000 shares of common stock then outstanding, approximately 74%, and on August 25, 2025 he purchased a further 6,425,267 shares for $64.26. Anzalone was CSquared's Chairman and Chief Executive Officer from its formation, was its sole director from December 10 to December 12, 2024, and from December 31, 2024 sat on a three-member board with B. Markinson and Ahmad, whom he called "my closest friend." After the conversion he served as Chief Executive Officer, President, Chief Financial Officer and Secretary.

105. Thus, Anzalone was a culpable participant in CSquared's violation. He personally made the misstatements and acted with scienter, as alleged herein. He did not act in good faith and directly induced the acts constituting the violation.

106. Under Section 20(a), Anzalone is liable jointly and severally with, and to the same extent as, CSquared, for damages in an amount to be determined at trial.

**<u>THIRD CAUSE OF ACTION</u>**

(Fraudulent Concealment)(against Anzalone)

107. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 86 as if fully set forth herein.

108. Defendant Anzalone engaged in a long-term criminal scheme, the purpose of which was to convince Innovent Fund to invest time and money into his business operations over a considerable period of time for the purpose of receiving funding to commence initial operations, ongoing business advice without charge and introductions to Innovent Fund's select group of start-

up capital investors.

109. During the entire length of Anzalone's business relationships with Plaintiff, Anzalone was conspicuously silent about his criminal history and restitution obligations, at all times encouraging Innovent Advisory and Innovent Fund's ongoing investment of time and money into Anzalone's business ventures (CSquared and then later NextLM) while being fully aware, at the same time, that the revelation of his criminal past would likely cause Innovent Fund and Innovent Advisory to immediately sever their business relationship with him.

110. Defendant Anzalone had a duty to disclose his criminal history, his active and ongoing restitution obligations, and the falsity of his represented credentials to Plaintiff, particularly given Plaintiff's role as investor and B. Markinson's board memberships. Anzalone also had a duty to disclose because he made partial statements about his background that were misleading without those facts, and because the facts were peculiarly within his knowledge. Plaintiff was relying on him to be truthful about his own history. That reliance was reasonable because the Note Purchase Agreements Anzalone executed incorporated the Rule 506(d) bad actor disqualifying events, signaling that the transactions were premised on the absence of such events among the persons covered by that rule, including the Company's chief executive officer.

111. Anzalone intentionally concealed from Plaintiff: (a) his federal conviction for Conspiracy to Commit Mail and Wire Fraud; (b) his active $16 million restitution judgment; (c) his active supervised release status; (d) Judge Moreno's directive that he not participate in financial enterprises; and (e) the falsity of his professional credentials.

112. Anzalone concealed these material facts with the intent to induce Plaintiff's investment and continued participation in his enterprises.

113. Plaintiff could not have discovered these concealed facts through reasonable

diligence at the time of investment, particularly in light of Anzalone's affirmative misrepresentations. Before the December 31, 2024 investment, Innovent investigated the business, its projections and its technology, and it relied on Anzalone's own account of his career, which described ten years as an institutional sales leader and gave no indication that he had spent that decade in federal custody.

114. Plaintiff justifiably relied on Anzalone's silence and deliberate and knowing misinformation regarding these material facts and his affirmative misrepresentations.

115. As a direct and proximate result of Anzalone's fraudulent concealment, Plaintiff suffered direct out-of-pocket damages.

**FOURTH CAUSE OF ACTION**

(Fraud)(against Anzalone)

116. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 86 as if fully set forth herein.

117. Defendant Anzalone made material misrepresentations of fact to Plaintiff, including false representations regarding his professional credentials, business accomplishments, and the status of his criminal history and financial obligations.

118. These misrepresentations were false when made and Defendant Anzalone knew them to be false.

119. The misrepresentations were made with the intent to deceive Plaintiff and to induce Plaintiff to invest capital, provide advisory services, and make valuable business introductions on behalf of Defendant Anzalone and his enterprises.

120. Plaintiff justifiably relied on Defendant Anzalone's misrepresentations in making its investments.

121. As a direct and proximate result of Defendant Anzalone's fraud, Plaintiff has suffered damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

(Fraudulent Inducement)(against Anzalone)

122. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 86 as if fully set forth herein.

123. Defendant Anzalone made material misrepresentations and omissions to Plaintiff for the purpose of inducing Plaintiff to enter into a business relationship with him and into agreements with CSquared and, later, NextLM.

124. But for Defendant Anzalone's fraudulent misrepresentations and omissions, Plaintiff would not have entered into these agreements or made the capital investments that it did.

125. Plaintiff justifiably relied on Defendant Anzalone's misrepresentations and omissions in entering into these agreements.

126. As a direct and proximate result of Defendant Anzalone's fraudulent inducement, Plaintiff has suffered damages in an amount to be determined at trial but currently believed to be in excess of $200,000.

**SIXTH CAUSE OF ACTION**

(Negligent Misrepresentation – pled in the alternative)(against Anzalone)

127. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 86 as if fully set forth herein.

128. Defendant Anzalone made misrepresentations of material facts to Plaintiff, including the representations regarding his professional credentials and business accomplishments and the incomplete representations regarding his criminal history and financial obligations

described herein.

129. Defendant Anzalone intended that Plaintiff rely on these representations in investing capital in CSquared and, later, NextLM, providing advisory services, and making business introductions. Anzalone had unique and superior knowledge of his own background. He stood in a relationship of trust and confidence with Plaintiff including through B. Markinson's service on the CSquared and NextLM boards. He knew Plaintiff would rely on his statements for these specific purposes.

130. Plaintiff justifiably relied on Defendant Anzalone's representations and, as a direct and proximate result, suffered direct out-of-pocket damages, including invested capital and out-of-pocket entity conversion expenses.

**SEVENTH CAUSE OF ACTION**

(Unjust Enrichment – pled in the alternative)(against Anzalone)

131. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 86 as if fully set forth herein.

132. Plaintiff conferred a benefit upon Defendant Anzalone, directly and through the entities he controlled, CSquared and NextLM, including $200,000 in capital investment and assistance with entity conversion. Anzalone personally benefited because these contributions increased the value of his controlling equity interest, including approximately 73.05% of NextLM he held through CaRA Consulting, LLC. This claim is pled in the alternative, to the extent the agreements described above are found void, rescinded, or not to govern the benefits conferred. Anzalone is not a party to those agreements in his individual capacity.

133. Defendant Anzalone had knowledge of the benefits conferred by Plaintiff.

134. Defendant Anzalone accepted and retained the benefits conferred by Plaintiff under

circumstances making it inequitable for him to retain such benefits without payment, given that the benefits were obtained through fraud, misrepresentation, and concealment.

135. It would be unjust and inequitable for Defendant Anzalone to retain these benefits without compensating Plaintiff.

136. As a result of Defendant Anzalone's unjust enrichment, Plaintiff has suffered direct out-of-pocket damages, including $200,000 in invested capital and out-of-pocket entity conversion expenses.

## EIGHTH CAUSE OF ACTION

(Rescission)(against Defendant NextLM)

137. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 86 as if fully set forth herein.

138. NextLM is named in this action solely because, pursuant to a Contribution and Exchange Agreement dated October 22, 2025, Innovent Fund contributed its CSquared convertible notes in exchange for two Convertible Promissory Notes issued by NextLM under a Note Purchase Agreement dated September 22, 2025, in the aggregate principal amount of $200,000, bearing interest at 8% per annum, compounded annually (together, the "NextLM Notes"). Plaintiff asserts no claim of independent wrongdoing against NextLM.

139. Anzalone executed the Note Purchase Agreement and the NextLM Notes on behalf of NextLM as its President and Chief Executive Officer. Innovent Fund's agreement to exchange its CSquared notes for the NextLM Notes was induced by the misrepresentations and concealment by Anzalone alleged above, which Anzalone made and continued while acting as NextLM's officer.

140. Innovent Fund did not learn the full extent of the facts concealed by Anzalone until

its counsel discovered them. Anzalone's December 5, 2025 account did not reveal those facts. Instead, he falsely assured Plaintiff that his record was clean and his history was behind him. Innovent Fund learned of the supervised release, the restitution judgment, and Anzalone's role as leader of the prior scheme in or about June 2026. It acted promptly upon that discovery to rescind the Note Purchase Agreement and the NextLM Notes, including by written notice of rescission delivered to NextLM and its counsel in September 2026 and by the filing of this action.

141. Innovent Fund hereby tenders the NextLM Notes for surrender and cancellation upon restitution of the consideration it provided and offers to do equity as the Court deems necessary to restore the parties to their prior positions.

142. Innovent Fund is entitled to rescission of the Note Purchase Agreement and the NextLM Notes and to restitution from NextLM of $200,000, together with interest.

143. Innovent Fund seeks rescission as its primary remedy against NextLM. Solely in the alternative, and without affirming or ratifying the Note Purchase Agreement or the NextLM Notes, Innovent Fund reserves all rights and remedies under those instruments, including its rights to information, to notice of default, and to acceleration.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant Christopher Anzalone on the First through Seventh Causes of Action and in favor of Innovent Fund against Defendant NextLM on the Eighth Cause of Action as follows:

A. Direct compensatory and out-of-pocket damages in an amount to be determined at trial, including $200,000 in invested capital and out-of-pocket entity conversion expenses;

B. As against NextLM only, rescission of the Note Purchase Agreement and the NextLM Notes and restitution of $200,000, together with interest;

C. Punitive damages against Defendant Anzalone in an amount sufficient to punish him for his willful, wanton, and malicious conduct and to deter similar conduct in the future;

D. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

E. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 27, 2026

Respectfully submitted,

**HABER LAW, LLP**
*Counsel for Plaintiff* 251 NW 23rd Street
Miami, FL 33127
Tel: (305) 379-2400
Fax: (305) 379-1106
Service E-Mail: service@haber.law

/s/ *Roger Slade*
ROGER SLADE, ESQ.
New York Bar No. 2253599
E-Mail: RSLADE@HABER.LAW